UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JEFFREY AUSTEN, ET AL., | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : NO. 3:09CV1257 (MRK) |
| | : |
| CATTERTON PARTNERS V, LP, ET AL., | : |
| | : |
| Defendants. | : |

## RULING AND ORDER

This case arises out of the October 2008 bankruptcy of three related companies that were in the business of making and distributing cookies – Defendant Archway & Mother's Cookies, Inc., a.k.a. Dough Co. ("Dough"), as well as non-parties Archway Cookies LLC ("Archway Cookies") and Mother's Cake & Cookie Co. ("Mother's"). The parties refer to these companies collectively as the "Archway Entities," and the Court will do the same. As a result of the bankruptcy, the Archway Entities' facilities were closed and its employees were terminated. Plaintiffs are two of those employees, and they bring this action on behalf of themselves and other similarly situated former employees of the Archway Entities.[1] Specifically, Plaintiffs claim that Defendants failed to provide 60-days advance notice of their termination in violation of the Worker Adjustment and Retraining Notification (WARN) Act, 29 U.S.C. §§ 2101 *et seq.*, and California Labor Code §§ 1400 *et seq.* ("Cal-WARN Act"), and they seek damages under those statutes. *See* Second Am. Compl. [doc. # 62].

---

[1] There is a pending Motion to Certify Class [doc. # 31], which is not the subject of this decision. Therefore, the Court does not address the arguments made by the Defendants about the proposed class. The Court will take up the class certification motion at a later time.

1

Defendants Catterton Partners V, LP ("Catterton Partners V"); Catterton Partners V Offshore, LP ("Catterton Offshore"); Catterton Coinvest I, LLC ("Catterton Coinvest"); and Insight Holdings LLC ("Insight") now move to dismiss Plaintiffs' Second Amended Complaint [doc. # 62] for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the *Federal Rules of Civil Procedure*.[2]  *See* Mot. to Dismiss [doc. # 69]; Mot. to Dismiss [doc. # 71].  Defendants argue that Plaintiffs have not pled sufficient facts from which the Court can conclude that Defendants were Plaintiffs' employer, and thus they are not subject to liability under the WARN Act or the Cal-WARN Act.[3]  Thus, the sole question before the Court is whether Catterton, which owns stock in the Archway Entities, and Insight, which Plaintiffs allege was the management firm through which Catterton operated the Archway Entities, are subject to liability as employers under the WARN Act.

For the reasons set forth below, the Court concludes that Plaintiffs have alleged sufficient facts to survive a motion to dismiss on this question, and therefore Catterton's Motion to Dismiss [doc. # 69] and Insight's Motion to Dismiss [doc. # 71] are DENIED.

**I.**

When considering a motion to dismiss, the Court accepts as true all factual allegations in the

---

[2] There are five Defendants in this case.  For ease of discussion, the Court will frequently refer to the three Catterton Defendants collectively as "Catterton," and Catterton and Insight collectively as "Defendants."  The fifth Defendant, Dough, has not filed a motion to dismiss, and thus is not included in the term "Defendants" for the purposes of this decision.

[3] Defendants' motions to dismiss encompass both the WARN Act and the Cal-WARN Act.  However, Defendants fail to address the Cal-WARN Act in their briefs.  Therefore, the Court assumes that Defendants' arguments apply to both statutes, and does not undertake a separate legal analysis as to the Cal-WARN Act.  If either party believes that the standards applicable to the Cal-WARN Act are different from those applicable to the federal WARN Act, they should have briefed those standards in the motions to dismiss.  Defendants will also be able to address the Cal-WARN Act at the summary judgment stage.

complaint and draws inferences from these allegations in the light most favorable to the plaintiff. *See Boykin v. KeyCorp*, 521 F.3d 202, 214 (2d Cir. 2008). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 95 (2d Cir. 2009). Two working principles underlie the Supreme Court's plausibility standard. *See id*. "First, although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions' and 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 129 S. Ct. at 1949). At the same time, the Supreme Court reiterated that the Rule 8 pleading threshold "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 129 S. Ct. at 1949. "'Second, only a complaint that states a plausible claim for relief survives a motion to dismiss' and 'determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id*. (quoting *Iqbal*, 129 S. Ct. at 1950). In the words of the Supreme Court:

> Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.

*Twombly*, 550 U.S. at 556 (internal quotation marks and citations omitted).[4]

---

[4] As Judge Diane Wood of the Seventh Circuit recently observed:

So, what do we take away from *Twombly, Erickson*, and *Iqbal*? First, a plaintiff must

As some commentators have noted, the distinction between a "conclusion" and a "fact" is not always easy to discern. If a plaintiff says that a defendant intended to, and did, punch the plaintiff in the nose, is that a statement of fact about the defendant's act and intent, or is it a conclusion since none of us is a mind reader? In most circumstances, the Court would consider that statement to be one of fact that the Court would be required to assume is true for purposes of a Rule 12(b)(6) motion. On the other hand, if a plaintiff baldy asserts that she was subjected to a "hostile work environment" without more, the Court would consider that statement be a mere conclusion – in the parlance of the Supreme Court, a "threadbare recital" – to which the Court need not defer. In the latter example, further facts would be needed (and in this example, the plaintiff certainly would know what environment she had been subjected to) in order to provide adequate notice to the defendant of the basis for the lawsuit and to make the plaintiff's hostile work environment claim plausible. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) ("Although [Rule 8] encourages brevity, the complaint must say enough to give the defendant 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'").

Context, good judgment and common sense mattered long before the Supreme Court decided *Twombly* and *Iqbal*, and they remain significant in deciding Rule 12(b)(6) motions even after those decisions. *Compare Albany Welfare Rights Org. Day Care Ctr., Inc. v. Schreck*, 463 F.2d 620 (2d

---

provide notice to defendants of her claims. Second, courts must accept a plaintiff's factual allegations as true, but some factual allegations will be so sketchy or implausible that they fail to provide sufficient notice to defendants of the plaintiff's claim. Third, in considering the plaintiff's factual allegations, courts should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements.

*Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

Cir. 1972) ("The allegation that the refusal to refer children to the Center was a retaliatory measure designed to prevent or to inhibit plaintiff Boddie from exercising First Amendment rights is wholly conclusory. No facts were alleged which would provide any ground for believing that the refusal was politically motivated or which would tend to explain why appellees should want to retaliate against Boddie. The complaint was thus properly dismissed as a matter of law.") *with Starr v. Sony BMG Music Entm't*, ___ F.3d ___, ___, 2010 WL 99346, at *6 (2d Cir. Jan. 13, 2010) (reversing a district court's dismissal of a complaint; "The present complaint succeeds where *Twombly's* failed because the complaint alleges specific facts sufficient to plausibly suggest that the parallel conduct was the result of an agreement among the defendants."); *see also id*. at ___, 2010 WL 99346, at *11 (Newman, J., concurring) (the Supreme Court in *Iqbal* "emphasized its view that whether a bare allegation of illegality would suffice to withstand a motion to dismiss *depends on the context in which the allegation is made*.") (emphasis added).

  Therefore, as it must, the Court takes the facts from the Second Amended Complaint [doc. # 62]. *See Hemi Group, LLC v. City of New York, N.Y.*, ___ U.S. ___, ___, 2010 WL 246151, at *3 (Jan 25, 2010) ("This case arises from a motion to dismiss, and so we accept as true the factual allegations in the City's second amended complaint.") (citing *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164 (1993)). The Court also assumes the parties' familiarity with the facts of this case, and thus discusses them here only briefly and very generally. More facts, including Plaintiffs' specific factual allegations, will be discussed as needed throughout this decision. In general, Plaintiffs allege that Catterton owned most or all of the stock in Dough, which is the parent of Archway Cookies and Mother's. Plaintiffs also claim that Catterton operated and managed the Archway Entities directly as well as through Insight, and that Catterton

and Insight made the decision to have the Archway Entities file for bankruptcy, close their plants, and fire their employees. Essentially, Plaintiffs allege that Defendants and the Archway Entities were a "single employer" for purposes of WARN Act liability.

## II.

The WARN Act prohibits employers of 100 or more employees from ordering "a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order." 29 U.S.C. § 2102(a); *see also Cashman v. Dolce Int'l./Hartford, Inc.*, 225 F.R.D. 73, 78 (D. Conn. 2004). Failure to provide a WARN Act notice subjects an employer to potential civil liability and civil penalties. Employers are potentially liable to each aggrieved employee (who suffers an employment loss as a result of the closing or layoff) for back pay and for benefits under an employee benefit plan (including the costs of medical expenses incurred during the employment loss), all calculated for the period of the WARN Act violation up to a maximum of 60 days. *See* 29 U.S.C. § 2104(a)(1). These specific monetary remedies are the exclusive remedies for violating the WARN Act.

This case raises the question of who is an "employer" for purposes of the WARN Act. Specifically, when can a parent company be held liable under the WARN Act for the actions of its subsidiary? The Second Circuit has not directly answered this question, and courts in other circuits have applied a variety of standards to determine the liability of a parent company under the WARN Act. *See Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484-87 (3d Cir. 2001) (discussing the various tests courts have used). However, one district court in this Circuit has adopted a test established by the Department of Labor (DOL) in its regulations issued pursuant to the WARN Act. *See Vogt v. Greenmarine Holding, LLC*, 318 F. Supp. 2d 136 (S.D.N.Y. 2004); 20 C.F.R.

§ 639.3(a)(2). In *Vogt*, Judge Gerard Lynch (now a member of the Second Circuit) relied on a decision by the Third Circuit in *Pearson* to conclude that the DOL test is the appropriate one for determining the liability of a parent corporation under the WARN Act. He did so largely because the DOL test was created with WARN Act policies in mind and because it incorporates other relevant federal labor law standards. *See* 318 F. Supp. 2d at 140-41. Furthermore, there appears to be a trend developing in the case law favoring the DOL test, as it has also been adopted by the Fifth and Ninth Circuits. *See Administaff Cos., Inc. v. New York Joint Bd., Shirt & Leisurewear Div.*, 337 F.3d 454 (5th Cir. 2003); *Childress v. Darby Lumber, Inc.*, 357 F.3d 1000 (9th Cir. 2004). Finally, the Second Circuit, in dicta, has suggested that the DOL test is appropriate when determining the liability of a parent corporation. *See Coppola v. Bear Stearns & Co., Inc.*, 499 F.3d 144, 150 (2d Cir. 2007) ("Of course, the DOL factors may be relevant to the question of whether the entities' relationship is in fact that of parent and subsidiary rather than debtor and creditor . . . ."). Fortunately, in this case the parties agree that the DOL test is the governing standard, and thus the Court need not wade into the debate. For the purposes of this case, the Court accepts the parties' agreement and will apply the DOL test.

Under the DOL test, there are five factors courts should consider when deciding whether to impose WARN Act liability on a parent corporation. Specifically, "[s]ome of the factors to be considered in making this determination are (i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations." 20 C.F.R. § 639.3(a)(2). As is apparent, from recitation of the test, it requires a fact-specific inquiry. Furthermore, no one factor is controlling and all factors need not be present for liability to attach.

> As the Third Circuit has noted, the DOL test is a balancing test "intended to discover whether . . . nominally separate entities actually functioned as a single business, particularly with regard to labor policy." *Pearson*, 247 F.3d at 498. The labor policy at issue in a WARN case is the decision to terminate the employment of a significant part of a company's work force.

*Vogt*, 318 F. Supp. 2d at 142. Thus, the purpose of the DOL test, and the focus of the Court's inquiry on the motions to dismiss, is to determine whether the Second Amended Complaint pleads sufficient facts to plausibly suggest that Defendants had "de facto control of the decision to effect a mass layoff of employees." *Id*. at 140. It is this decision, above all else, that gives rise to liability under the WARN Act. *See id*. at 143; *Pearson*, 247 F.3d at 496, 504.

### III.

The Court now turns to each factor of the DOL standard, and Plaintiffs' factual allegations relevant to each factor. Keeping in mind that the application of the DOL factors is a fact-intensive exercise, the Court concludes that Plaintiffs have alleged sufficient facts in their Second Amended Complaint [doc. # 62] to proceed to discovery. *See Pearson*, 247 F.3d at 496; *Bledsoe v. Emery Worldwide Airlines*, 258 F. Supp. 2d 780, 787 (S.D. Ohio 2003); *Hiles v. Inoveris, LLC*, No. 2:09-cv-53, 2009 WL 3671007, at *3 (S.D. Ohio Nov. 4, 2009). Of course, whether Plaintiffs will ultimately be able to sustain their claims is a different matter, and one on which the Court expresses no view.

<u>Common Ownership</u>

The first factor of the DOL test is common ownership. While a finding of common ownership "counts in favor of liability for [the parent]," such a finding "is of limited significance to the inquiry at hand, since it is well established that stock ownership alone is not grounds for holding a parent liable for its subsidiary's actions." *Vogt*, 318 F. Supp. 2d at 142 (*citing United States v.*

*Bestfoods*, 524 U.S. 51, 61-62 (1998)).

Without doubt, Plaintiffs' allege that Catterton owned the Archway Entities through its control of 100% of Dough's stock, and Dough's ownership of the other Archway Entities. *See* Second Am. Compl. [doc. # 62] ¶¶ 11, 13, 15, 18-19. In fact, Defendants do not contest Catterton's ownership of Dough. *See* Mem. of Law in Support of Defs.' Renewed Mot. to Dismiss [doc. # 70] ("Defs.' Mem.") at 10. Therefore, Plaintiffs have satisfied this prong of the DOL test as to Catterton.

However, Plaintiffs have made no allegations regarding Insight's ownership of the Archway Entities. *See id*. Nor could they, since Insight did not own the Archway Entities. Instead, Plaintiffs allege that Insight is the management company that Catterton used to control the operations of the Archway Entities. *See* Second Am. Compl. [doc. # 62] ¶¶ 20, 34, 69-70, 72; *see also* Pls.' Mem. in Opp. to Defs.' Renewed Mot. to Dismiss [doc. # 85] ("Pls.' Resp.") at 21. As the Second Amended Complaint puts it, Insight was Catterton's agent in managing and controlling the Archway Companies. *See* Second Am. Compl. [doc. # 62] ¶¶ 20, 34. However, these allegations bear on other factors of the DOL test; they do not support common ownership. Therefore, Plaintiffs have failed to satisfy this prong of the test as to Insight. However, the Court notes that lack of ownership does not defeat Plaintiffs' claim as to Insight, as a management company may also be an employer under the WARN Act. *See generally Local 217, Hotel & Restaurant Employees Union v. MHM, Inc.*, 976 F.2d 805 (2d Cir. 1992) (imposing WARN Act liability on a hotel management company).

<u>Common Directors and/or Officers</u>

The second factor of the DOL test "ordinarily looks to whether the two nominally separate corporations: (1) actually have the same people occupying officer or director positions with both companies; (2) repeatedly transfer management-level personnel between the companies; or (3) have

officers and directors of one company occupying some sort of formal management position with respect to the second company." *Pearson*, 247 F.3d at 497. In applying this prong, the Court "should look only to whether some of the same individuals comprise (or, at some point, did comprise) the formal management team of each company." *Id*. Like the first factor, a finding of common directors and/or officers favors parental liability but is of limited importance:

> As the Supreme Court has noted: "[I]t is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary. . . . Since courts generally presume that the directors are wearing their subsidiary hats and not their parent hats when acting for the subsidiary, it cannot be enough to establish liability . . . that dual officers and directors made policy decisions and supervised activities at the [subsidiary]."

*Vogt*, 318 F. Supp. 2d at 142 (quoting *Bestfoods*, 524 U.S. at 69-70) (internal quotation marks omitted); *see generally Yankee Gas Serv. Co. v. UGI Utilities, Inc.*, 616 F. Supp. 2d 228, 240-45 (D. Conn. 2009).

Plaintiffs have satisfied this prong of the test as to both Catterton and Insight. Specifically, Plaintiffs have alleged that the boards of directors of the Archway Entities were composed entirely of individuals from Insight and Catterton. *See* Second Am. Compl. [doc. # 62] ¶¶ 23, 31-32, 66. The Complaint also lists seven individuals who were in management, director, or officer positions with Insight or Catterton and the Archway Entities. *See id*. ¶¶ 24-30. These allegations, which the Court must accept as true, are easily sufficient to satisfy this prong of the DOL standard.

<u>Unity of Personnel Policies Emanating from a Common Source</u>

The third prong of the DOL test "is analogous to the aspect in the federal labor law test concerning 'centralized control of labor operations,' which the Second Circuit has considered to include factors such as centralized hiring and firing, payment of wages, maintenance of personnel

records, benefits and participation in collective bargaining." *Vogt*, 318 F. Supp. 2d at 142-43 (*citing Clinton's Ditch Coop. Co. v. NLRB*, 778 F.2d 132, 138-39 (2d Cir. 1985)); *see also Pearson*, 247 F.3d at 499 ("We begin by interpreting the language of this prong to require the factfinder to focus the inquiry less on the hierarchical relationship between the companies (as such relationships may be considered in other aspects of the test) than on whether the companies actually functioned as a single entity with regard to its relationships with employees.").

In *Pearson*, the plaintiffs alleged that the parent entity "made the decision to close the plant, and because the plant closing is the relevant practice giving rise to the litigation, submit that that decision is enough to tip the balance." 247 F.3d at 500. However, the Third Circuit concluded that, "for WARN Act purposes, allegations of this kind of 'direct' control are more appropriately considered as part of the 'de facto exercise of control' factor." *Id*. In contrast, Judge Lynch in *Vogt* concluded that because, "[i]n the context of the WARN Act, the decision to effect a mass layoff is the single most important personnel policy," plaintiffs' allegation that the parent controlled this decision was sufficient to satisfy the "unity of personnel policies" prong of the test – even where plaintiffs made "no allegation that defendant companies controlled [the subsidiary's] quotidian policies such as individual hirings, firings, benefit provision or record maintenance." 318 F. Supp. 2d at 143.

While (in the end) it may not matter under which framework one considers this allegation, the Court agrees with the Third Circuit that allegations of direct control of the ultimate decision – the plant closing or mass layoff – are more relevant to the "de facto exercise of control" factor, and not the "unity of personnel policies factor." This distinction is relevant in this case because Plaintiffs' allegations regarding unity of personnel policies largely focus on the decision to close the

Archway facilities and terminate employees. *See* Second Am. Compl. [doc. # 62] ¶¶ 84, 87, 89. As Defendants correctly point out, Plaintiffs' allegations not related to the decision to close the facilities only support the inference "that there were common labor policies among the Archway Entities, not among the Archway Entities and Catterton and Insight." Defs.' Mem. [doc. # 70] at 14. Therefore, Plaintiffs have not pled facts sufficient to satisfy this prong of the DOL test.

### Dependency of Operations

The factors to be considered under the fourth prong of the DOL test are: "sharing of administrative or purchasing services, interchanges of employees or equipment, or commingled finances." *Vogt*, 318 F. Supp. 2d at 143. "However, the mere fact that the subsidiary's chain-of-command ultimately results in the top officers of the subsidiary reporting to the parent corporation does not establish the kind of day-to-day control necessary to establish an interrelation of operations." *Pearson*, 247 F.3d at 501.

Plaintiffs rely on three arguments to support its claim that there was a dependency of operations between Defendants and the Archway Entities: (1) that Defendants did not observe the corporate form; (2) that the Archway Entities relied on Defendants to obtain loans and financing; (3) that Insight ran the day-to-day operations of the Archway Entities, under the direction of Catterton. *See* Pls.' Resp. [doc. # 85] at 25.

The first argument – that Defendants failed to observe the corporate form – is based on allegations in the Complaint that discuss the shared operations of Dough and the other Archway Entities. *See id.*; Second Am. Compl. [doc. # 62] ¶¶ 76-80. But these allegations say nothing about the relationship between Defendants and the Archway Entities. The second argument is based on the fact that Catterton helped the Archway Entities obtain a loan, *see* Pls.' Resp. [doc. # 85] at 25;

12

Second Am. Compl. [doc. # 62] ¶¶ 73-74, but arranging a loan does not amount to "commingled finances."

However, the third argument is more than sufficient to establish dependency of operations. At least one court has held that an allegation that, on information and belief, the parent directly owned and operated the subsidiary is sufficient to satisfy this prong at the motion to dismiss stage. *See Hiles*, 2009 WL 3671007, at *2-*3. Plaintiffs allege far more – specifically, they claim that there was a dependency of operations, that Insight was hired by Catterton to handle the day-to-day operations of the Archway Entities, and that Catterton and Insight "carried out the financial, operational and management functions necessary to run the Archway entities." Second Am. Compl. [doc. # 62] ¶¶ 67, 69-72. Thus, the Second Amended Complaint alleges that Catterton and Insight "directly managed" and "ran the day-to-day operations of the Archway Entities, *id*. ¶ 36, and "carried out the financial, operational and management functions necessary to run the Archway Companies," *id*. ¶ 71, and that "all significant decisions involving the management of Archway Entities were made by" Catterton and Insight, *id*. at ¶ 75. Taken together, these allegations are more than adequate to satisfy this factor of the DOL test at the motion to dismiss stage.

## De Facto Control

*De facto* control is perhaps the most important prong of the DOL test, as it focuses on whether "the parent . . . was the decisionmaker responsible for the employment practice giving rise to the litigation.'" *Pearson*, 247 F.3d at 503-04. "[B]ecause the balancing of the factors is not a mechanical exercise, if the de facto exercise of control [is] particularly striking . . . then liability might be warranted even in the absence of the other factors." *Id*. at 504.

The Court need not decide whether Plaintiffs' bare assertion that Defendants were in *de facto*

13

control of the Archway Entities is sufficient under *Iqbal* and *Twombly*, because Plaintiffs make several allegations regarding Defendants' direct control over the Archway Entities. *See* Second Am. Compl. [doc. # 62] ¶¶ 20, 36, 69-72, 75. Most importantly, Plaintiffs allege that Defendants made the decision to file for bankruptcy, shut down the Archway Entities' facilities, and terminate their employees – the precise decisions with which the WARN Act is concerned. *See id.* ¶¶ 40-41, 66(c), 84. Taken together, these allegation lead to an inference that Defendants exercised *de facto* control over the Archway Entities. In fact, the allegation that Defendants made the decision to shut down the facilities, standing alone, might be sufficient to satisfy this factor. *See Pearson*, 247 F.3d at 504; *see also Hiles*, 2009 WL 3671007, at *2-*3.

Defendants argue that the allegations regarding *de facto* control are too "broad and conclusory" to survive a motion to dismiss. Defs.' Mem. [doc. # 70] at 13 (*citing Vogt*, 318 F. Supp. 2d at 144). In *Vogt*, Judge Lynch held that an allegation that "[t]he Defendants controlled the capitalization of OMC, engaged in major reorganizational activities at OMC in the several years prior to the bankruptcy, made the decisions regarding lay-offs and plant closings, [and] made the decision to file for Chapter 11 bankruptcy" was "broad and conclusory" because it "fail[ed] to name any specific actions taken by specific defendants." 318 F. Supp. 2d at 144 (internal quotation marks omitted). However, Judge Lynch also concluded that allegations that two specific defendants "directed the employer to enter bankruptcy and shut its facilities" were sufficient to survive a motion to dismiss. *Id*. The apparent disconnect between these conclusions can be explained by the fact that *Vogt* involved eight defendants, and therefore an allegation that referred to "defendants" generically was too broad (as it was in *Iqbal*), while an allegation that specifically referred to two of the defendants was sufficient.

14

The same problem does not exist in this case, where Plaintiffs' allegations regarding the decision to enter bankruptcy, and the subsequent facility closings and lay-offs, implicate Catterton and Insight only.[5]  Therefore, at least for purposes of a motion to dismiss, Plaintiffs have satisfied the fifth prong of the DOL test.

## IV.

In sum, on the basis of the Second Amended Complaint, Plaintiffs have pled sufficient facts regarding the "common directors and/or officers," "dependency of operations," and "*de facto* control" prongs of the DOL test as to Catterton and Insight, as well as the "common ownership" prong as to Catterton, to state a plausible claim for employer liability under the WARN Act.  Most importantly, Plaintiffs have alleged that Catterton and Insight were responsible for making and implementing the decisions that give rise to this litigation.  Therefore, Catterton's Motion to Dismiss [doc. # 69] and Insight's Motion to Dismiss [doc. # 71] are DENIED.

---

[5] Defendants point out, correctly, that the Second Amended Complaint does not distinguish between the Catterton entities beyond their differential ownership of Dough's stock.  However, the Court can infer from the Complaint that the Catterton entities are jointly managed.  During an on-the-record telephonic conference with the parties on February 3, 2010, counsel for Defendants explained that the three Catterton entities were created by Catterton Partners, a non-party, as limited partnerships and limited liability companies for the purpose of making investments.  However, Defendants' counsel was not sure of the extent of overlap in management personnel between Catterton Partners and the Catterton investment entities.  The Court believes that Plaintiffs are entitled to discovery on this issue.  Plaintiffs' counsel represented to the Court that if he learns that Catterton Offshore and Catterton Coinvest were not involved in the management of the Archway Entities, he will dismiss those Defendants, as well he should.

IT IS SO ORDERED.


/s/   Mark R. Kravitz
United States District Judge

Dated at New Haven, Connecticut: **February 17, 2010.**