UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JEFFREY AUSTEN, DAVID A. ICARDI, | : : : | |
| Plaintiffs, | : : | |
| v. | : : | No. 3:09cv1257 (MRK) |
| CATTERTON PARTNERS V, LP; CATTERTON PARTNERS V OFFSHORE, LP; CATTERTON COINVEST I, LLC; INSIGHT HOLDINGS, LLC; ARCHWAY & MOTHER'S COOKIES, INC. a.k.a. DOUGH CO., | : : : : : : : : | |
| Defendants. | : | |

## MEMORANDUM OF DECISION

This lawsuit arises out of the October 2008 bankruptcies of three related cookie companies – Defendant Archway & Mother's Cookies, Inc., a.k.a. "Dough Co.";[1] non-party Archway Cookies LLC; and non-party Mother's Cake & Cookie Co. – collectively, the Archway Entities. Defendants Catterton Partners V, LP; Catterton Partners V Offshore, LP; and Catterton Coinvest I, LLC – collectively, the Catterton Defendants – are allegedly the Archway Entities' shareholders. Insight Holdings, LLC ("Insight Holdings") is allegedly the management firm that the Catterton Defendants hired to run the Archway Entities. Following their bankruptcies, the Archway Entities closed their facilities and terminated their employees, including Plaintiffs Jeffrey Austen and David Icardi. Mr. Austen and Mr. Icardi claim that Defendants are liable under the Worker Adjustment and Retraining Notification ("WARN") Act, 29 U.S.C. §§ 2010 *et*

---

[1] Pursuant to a stipulation that the Court approved on January 12, 2010, litigation of the claims against Dough Co. is currently on hold. *See* Order [doc. # 84].

*seq.*, and California Labor Code §§ 1400 *et seq.* ("Cal-WARN Act"), for failing to provide the Archway Entities' employees with sixty days advance notice of the closings.

Pending before the Court is the Catterton Defendants' Motion for an Order Permitting Defendants' Counsel to Contact Putative Class Members and Clarifying the Status of Representation of Putative Class Members [doc. # 170]. Also pending before the Court is Insight Holdings' Joinder to the Motion for an Order Permitting Defendants' Counsel to Contact Putative Class Members and Clarifying the Status of Representation of Putative Class Members [doc. # 171]. Counsel for the Catterton Defendants and Insight Holdings seek an order from this Court authorizing them to contact putative class members, and clarifying that counsel for named plaintiffs Jeffrey Austen and David A. Icardi do not yet represent putative class members. As set forth below, the two motions are GRANTED IN PART and DENIED IN PART. Although the Court does not believe that counsel for any party has engaged in any misconduct to date, the Court believes that under the current circumstances, there is a basis for imposing limited restrictions on the parties' communications and counsels' communications with putative class members prior to class certification.

**I.**

The Court discussed the facts of this case at some length in its decision denying Defendants' motions to dismiss for failure to state a claim. *See Austen v. Catterton Partners V, LP*, 709 F. Supp. 2d 168, 168 (D. Conn. 2010). In this Ruling and Order, the Court sets forth only the factual and procedural background underlying the two pending motions.

Mr. Austen and Mr. Icardi moved for class certification in this case on October 6, 2009. *See* Mot. for Class Certification [doc. # 31]. The Court held oral argument on their motion for class certification on May 24, 2010. On June 7, 2010, the Court issued a decision denying the

motion for class certification without prejudice to renewal. *See Austen v. Catterton Partners V, LP*, 268 F.R.D. 146, 148 (D. Conn. 2010). In dismissing the motion without prejudice, the Court reasoned at the outset that additional discovery was needed to determine whether it would be appropriate to certify a class consisting of employees at several small, remote facilities, as well as employees at the Archway Headquarters in Battle Creek, Michigan (the "Battle Creek Headquarters") and a large bakery in Ashland, Ohio (the "Ashland Bakery"). *See id.* at 147-48. But the Court also indicated that it would "*certainly* certify a class consisting of the employees at the Battle Creek Headquarters and the Ashland Bakery, even if it ultimately concludes that certification is not appropriate for the remote employees." *Id.* at 153 (emphasis added). Discovery in this case is currently scheduled to conclude on April 15, 2011; Mr. Austen and Mr. Icardi have not yet renewed their motion for class certification.

In early February 2011, the Court began to receive communications from Plaintiffs' counsel and from Defendants' counsel regarding Defendants' attempts to communicate with putative class members. Specifically, Plaintiffs' counsel alleged improprieties by Defendants' counsel in their communications during discovery with Jennifer Marquette, who was the Vice President of Human Resources at Dough Co. at the time of the bankruptcies. *See* Marquette Dep. [doc. # 170-2] at 11. Plaintiffs' counsel was particularly concerned that one of Defendants' lawyers, Linda M. Inscoe of Latham & Watkins LLP ("Latham & Watkins"), had a prior working relationship with Ms. Marquette, and believed that Attorney Inscoe was trying to take advantage of the prior relationship to coerce Ms. Marquette to sign an affidavit against her own interests and against the interests of other putative class members. At that time, a deposition of Ms. Marquette had been noticed for February 14, 2011; Attorney Inscoe planned to lead that deposition for Defendants. *See id.* at 1. Out of an abundance of caution, the Court encouraged

Defendants' counsel to instead have Peter L. Winik of Latham & Watkins lead the deposition for Defendants, and agreed to join the deposition via telephone to encourage Ms. Marquette to tell the truth and to assure her that she should not be intimidated by Attorney Inscoe's presence during the deposition. *See id.* at 6-8.

On March 2, 2011, the Court held an on-the-record telephonic status conference with the parties to discuss the allegedly improper communications between Defendants' counsel and putative class members. Following the conference, the Court ordered the parties to submit briefs on two issues: (1) whether Defendants' counsel could contact putative class members without notice to Plaintiffs' counsel and without Plaintiffs' counsel being present; and (2) whether Plaintiffs' counsel represented the putative class members even though no class had yet been certified. *See* Order [doc. # 165]. In connection with that order, Defendants' counsel submitted a copy of Ms. Marquette's deposition transcript to the Court, which the Court has read. *See* Marquette Dep. [doc. # 170-2].

Ms. Marquette primarily testified at her deposition about facts relevant to the merits of this case. She testified that during her time at Dough Co., she was responsible for overseeing plant closings, and had specific responsibility for WARN Act notifications. *See id.* at 15. Ms. Marquette also testified about the relationship between Dough Co. and the Catterton Defendants, *see id.* at 17; about the number of employees who worked at various Dough Co.-related facilities, *see id.* at 19-20; and about the fact that some of the same people performed worked at multiple different Dough Co.-related facilities. *See id.* at 21-22. Ms. Marquette is currently the Director of Human Resources for Snyder's Lance, Inc., which now operates the Ashland Bakery that used to be run by Dough Co. *See id.* at 10-11. When the bankruptcies occurred, Ms. Marquette also

stayed on for a time at the Ashland Bakery working for a bank as it attempted to sell the bankrupt companies' assets. *See id.* at 11.

In addition to testifying about facts relevant to the merits of this case, Ms. Marquette also testified about her prior communications with Defendants' counsel. Ms. Marquette testified that she knew Attorney Inscoe because Attorney Inscoe was the Dough Co. Human Resources Department's main contact at its outside counsel, Latham & Watkins. *See id.* at 185. Ms. Marquette regularly sought legal advice from Attorney Inscoe when Ms. Marquette was working for Dough Co. *See id.* In September 2010, Attorney Inscoe reached out to Ms. Marquette via telephone and email to ask her for information about Dough Co.'s operations before the bankruptcies. *See id.* at 187. Attorney Inscoe did not tell Ms. Marquette why she was asking for the information, but Ms. Marquette assumed it was for the purpose of defending a lawsuit. *See id.* at 188. Ms. Marquette even assumed that Attorney Inscoe was representing one or more Defendants in this very case, although she was not sure whether Attorney Inscoe was representing the Catterton Defendants or Insight Holdings. *See id.* at 210-11. Ms. Marquette asked Attorney Inscoe if she needed to have a lawyer present for their communications; Attorney Inscoe indicated that she did not think Ms. Marquette needed a lawyer, but that it was ultimately up to Ms. Marquette to decide. *See id.* at 190. Ms. Marquette discussed with Attorney Inscoe the possibility of signing a declaration or affidavit about Dough Co.'s operations, and eventually, Latham & Watkins prepared a draft declaration or affidavit. *See id.* at 150-51. Ms. Marquette sent revisions to that draft to Attorney Inscoe, but in the end, Ms. Marquette never signed a declaration or affidavit. *See id.* at 152. Ms. Marquette testified that while she felt obligated to cooperate with Attorney Inscoe, she never felt intimated and was always truthful in her communications with Attorney Inscoe. *See id.* at 152-53.

5

Ms. Marquette also testified at the deposition that she has long believed that one of Plaintiffs' lawyers, Jack A. Raisner of Outten & Golden LLP ("Outten & Golden"), has been acting as her attorney. *See id.* at 154. Ms. Marquette never signed an engagement letter with Attorney Raisner, and never came to any verbal agreement with Attorney Raisner or with his law firm. *See id.* at 154-56. Instead, Ms. Marquette simply received a letter informing her about the pendency of this action. *See id.* at 156. She assumes that because this action is a class action, and because she has not yet opted out, Attorney Raisner must be acting as her attorney. *See id.* Attorney Raisner and Attorney Rene S. Roupinian, also of Outten & Golden, held two telephone meetings with Ms. Marquette to help her prepare for her deposition. *See id.* at 156-57.

## II.

### A.

Thirty years ago, in *Gulf Oil Co. v. Bernard*, 452 U.S. 89 (1981), the Supreme Court recognized that district courts have limited discretion to oversee communications between counsel in class actions and actual or putative class members. *See Gulf Oil*, 452 U.S. at 100; *see also* Fed. R. Civ. P. 1 (instructing courts to construe the *Federal Rules of Civil Procedure* "to secure the just, speedy, and inexpensive determination of every action and proceeding"); Fed. R. Civ. P. 23(d) (specifically authorizing district courts to take various steps in order to ensure fairness in class action cases). The Supreme Court reasoned that district courts sometimes need to regulate such communications in order to curtail and prevent abusive litigation tactics:

> Class actions serve an important function in our system of civil justice. They present, however, opportunities for abuse as well as problems for courts and counsel in the management of cases. Because of the potential for abuse a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties. But this discretion is not unlimited, and indeed is bound by the relevant provisions of the federal rules.

*Gulf Oil*, 452 U.S. at 100. The Supreme Court also articulated a standard for district courts to apply when deciding whether to limit such communications:

> [A]n order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for limitation and the potential interference with the rights of the parties. Only such a determination can ensure that the court is furthering, rather than hindering, the policies embodied in the *Federal Rules of Civil Procedure*, especially Rule 23. In addition, such a weighing – identifying the potential abuses being addressed – should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances.

*Id.* at 101-02. The Supreme Court has never revisited *Gulf Oil*.

Because the parties dispute the extent to which *Gulf Oil* controls this Court's decision regarding whether to limit communications between Defendants' counsel and putative class members, the Court sets forth the facts of the case in detail. *Gulf Oil* was an employment discrimination case pitting current and former black employees against the owners of an oil refinery in Port Arthur, Texas. *See id.* at 91. When the lawsuit began, the refinery had recently entered into an agreement with the Equal Employment Opportunity Commission ("EEOC") to cease various discriminatory practices against black and female employees. The refinery had also begun sending offers of back pay and liability release forms to its current and former employees. *See id.* After the litigation commenced, the refinery's counsel moved in the district court for an order limiting both parties' ability to communicate with class members other than the named plaintiffs. *See id.* at 92. In support of the motion, the refinery's counsel asserted that it had ceased sending back pay offers and release forms to class members, but that plaintiffs' counsel – the NAACP Legal Defense and Education Fund – had continued to send communications to class members discouraging them from accepting back pay offers or signing releases. *See id.* at 92-93.

The district court thereafter issued two orders prohibiting the parties and their counsel from contacting actual or potential class members other than the named parties. The district

court's initial, temporary order prohibited "all communications concerning the case from parties or their counsel to potential or actual class members." *Id.* at 93. The district court's second order essentially adopted the language of a sample order from the *Manual of Complex Litigation*, and imposed "a complete ban on all communications concerning the class action between parties or their counsel and any actual or potential class member who was not a formal party, without the prior approval of the court." *Id.* at 93-95.

Under the second order, the district court denied a request by plaintiffs' counsel to send actual and potential class members a leaflet encouraging them to talk to a lawyer before signing any release form from the refinery. The Supreme Court eventually held that the district court abused its discretion by issuing the orders without basing them on "a clear record and specific findings that reflect[ed] a weighing of the need for a limitation and the potential interference with the rights of the parties." *Id.* at 101. The Supreme Court noted in its decision that district courts should exercise caution in drafting orders limiting the ability of the parties and their counsel to communicate with class members, and should pay "attention to whether [a] restraint is justified by a likelihood of serious abuses." *Id.* at 104.

The Second Circuit has applied *Gulf Oil* only once, in *Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590 (2d Cir. 1986). *Rossini* was a sex discrimination case against a Madison Avenue advertising firm that was filed several years before the Supreme Court's decision in *Gulf Oil*. *See id.* at 594. When the plaintiffs complained to the district court about a questionnaire the firm sent to its female employees upon the commencement of the litigation, the district court issued an order "requiring prior court approval of virtually all oral and written communications between the parties and potential members of the class," relying on the same sample order from the *Manual of Complex Litigation* that the district court in *Gulf Oil* relied on. *See id.* at 601. The

district court later limited its earlier order to apply only to written communications. *See id.* After the Supreme Court's decision in *Gulf Oil*, the plaintiffs moved to vacate the district court's order, but the district court never acted on the motion. *See id.*

On appeal by the plaintiffs, the Second Circuit held that the district court did not abuse its discretion by issuing the two orders limiting communications between the parties and potential members of the class. *See id.* The Second Circuit reasoned that "[u]nlike the order at issue in *Gulf Oil*, the order[s] . . . were based on specific findings of fact." *Id.* at 602. The Second Circuit noted that the orders "may have been broader than necessary to curb the abuses found by the court," but that the fact that the order might have gone farther than necessary was of no moment because neither party asked the district court to issue a more narrowly drawn order. *Id.* at 602.

Two other Second Circuit cases are relevant to the issue before the Court in this case. First, in *Weight Watchers of Philadelphia, Inc. v. Weight Watchers International, Inc.*, 455 F.2d 770 (2d Cir. 1972) (Friendly, J.), which was decided nine years before the Supreme Court's *Gulf Oil* decision, the Second Circuit reasoned in dicta that a defendant may unilaterally engage in settlement negotiations with putative class members without violating Rule 23: "[A] plaintiff has no legally protected right to sue on behalf of other[s] . . . who prefer to settle; . . . [Rule 23] does not bar non-approved settlements with individual members which have no effect upon the rights of others." *Id.* at 775. Second, six years after the Supreme Court's *Gulf Oil* decision, the Second Circuit adopted that dictum from *Weight Watchers* as a holding in *Christensen v. Kiewit-Murdock Investment Corp.*, 815 F.2d 206, 213 (2d Cir. 1987) ("*Weight Watchers* establishes that, at least prior to class certification, defendants do not violate Rule 23[] by negotiating settlements with potential members of a class.").

The Supreme Court's holding in *Gulf Oil*; the Second Circuit's holdings in *Rossini* and *Christensen*; and the Second Circuit's dicta from *Weight Watchers* seemingly indicate that this Court must carefully follow certain principles when deciding whether to limit communications by parties and counsel with putative class members before class certification. First, any "order limiting communications between parties and potential class members [must] be based on a clear record and specific findings that reflect a weighing of the need for limitation and the potential interference with the rights of the parties." *Gulf Oil*, 452 U.S. at 101; *Rossini*, 798 F.2d at 602. Second, any such order must "limit[] speech as little as possible, consistent with the rights of the parties under the circumstances." *Gulf Oil*, 452 U.S. at 102. Third, in crafting any such order, the Court must pay "attention to whether [a particular] restraint is justified by a likelihood of serious abuses." *Id.* at 104. Fourth, mere *ex parte* communications between defense counsel and putative class members – even *ex parte* settlement negotiations – are not abusive communications that warrant limitations absent indications in the record of the need for limitations. *See Christensen*, 815 F.2d at 213; *Weight Watchers*, 455 F.2d at 775. Numerous district court decisions from within the Second Circuit have framed the applicable principles similarly. *See Fengler v. Crouse Health Systems, Inc.*, 634 F. Supp. 2d 257, 261-62 (N.D.N.Y. 2009); *In re Initial Public Offering Securities Litigation*, 499 F. Supp. 2d 415, 418-19 (S.D.N.Y. 2007); *In re Worldcom Securities Litigation*, No. 02cv3288 (DLC), 2003 WL 22701241, at *7-*8 (S.D.N.Y. Nov. 17, 2003); *E.E.O.C. v. Morgan Stanley & Co., Inc.*, 206 F. Supp. 2d 559, 561-63 (S.D.N.Y. 2002); *Cohen v. Apache Corp.*, No. 89cv0076 (PNL) 1991 WL 1017, at *2 (S.D.N.Y. Jan. 2, 1991) (Leval, J.).[2]

---

[2] The Court agrees with Plaintiffs that "the rules governing . . . communications with putative class members have little if anything to do with the attorney-client relationship." Mem. in Opp. [doc. # 172] at 5. *Gulf Oil* clearly permits a district court to regulate communications with putative class members even when they are not yet technically represented by class counsel. *See* 452 U.S. at 101 (permitting district courts to regulate communications with "potential" class members before certification).

In opposition to the pending motion, however, Plaintiffs suggest that this Court need not apply the principles set forth in *Gulf Oil* and the other cases discussed above. Instead, according to Plaintiffs, this Court has virtually unlimited authority to restrict defendants' and defendants' counsels' communications with putative class members – as opposed to plaintiffs' and plaintiffs' counsels' communications with putative class members – even absent any specific findings regarding the need for such restrictions and absent any showing that "serious abuses" are likely. *Gulf Oil*, 452 U.S. at 102; *see* Mem. in Opp. [doc. # 172] at 5-9. In support of their position, Plaintiffs rely almost exclusively on a single district court decision, *In re Currency Conversion Fee Antitrust Litigation*, 361 F. Supp. 2d 237 (S.D.N.Y. 2005), which they characterize as "the leading case in the Second Circuit" on a district court's authority to regulate communications between defense counsel and putative class members before certification. *See* Mem. in Opp. [doc. # 172] at 1. It is not entirely clear to the Court why Plaintiffs believe that *In re Currency Conversion* is "the leading case in the Second Circuit" on that issue. *Id*. In any case, *In re Currency Conversion* is a district court decision and thus does not bind this Court. *See In re Dow Corning Corp.*, 261 F.3d 280, 287 (2d Cir. 2001); *United States v. Articles of Drug Consisting of 203 Paper Bags*, 818 F.2d 569, 571 (7th Cir. 1987) (Posner, J.) (noting that district court decisions do not even "bind[] . . . other district court judges in the same district"). This Court need only follow that decision to the extent that it finds it to be persuasive.

Because Plaintiffs rely so heavily on *In re Currency Conversion*, the Court sets forth the facts of the case in detail. *In re Currency Conversion* was an antitrust action in which the plaintiffs alleged that the defendant credit card companies conspired to fix foreign currency conversion fees. *See* 361 F. Supp. 2d at 243. During the pendency of the litigation, the credit card companies sought approval from their existing cardholders to modify their cardholder

11

agreements to include arbitration clauses. *See id.* at 243-44. The district court reasoned that the defendant's "unsupervised communications" with putative class members to change the terms of their cardholder agreements had been improper, and held that for that reason, the arbitration agreements were invalid. *See id.* at 254. In so holding, the district court reasoned that the *Gulf Oil* rule requiring a district court to make specific findings regarding the likelihood of abuses before restricting pre-certification communications with putative class members only applies to restrictions on the plaintiff's and plaintiff's counsel's communications. *See id.*

This Court is not persuaded by the *In re Currency Conversion* court's conclusion for four reasons. First, while the *In re Currency Conversion* court indicated that *Gulf Oil* "addressed restrictions imposed by the trial court on *plaintiffs'* counsel's communications with putative class members," *id.*, in fact, *Gulf Oil* addressed restrictions imposed on both parties' communications. *See* 452 U.S. at 93-95. Second, the *In re Currency Conversion* court failed to cite the Second Circuit's decision in *Rossini*, which also addressed restrictions on both parties' communications. *See* 798 F.2d at 601. Third, nothing in the Supreme Court's reasoning in *Gulf Oil* or the Second Circuit's reasoning in *Rossini* so much as suggests that the principles of *Gulf Oil* extend only to restrictions on a plaintiff's communications. Fourth, and most importantly, the *In re Currency Conversion* court in fact had before it a record of serious abuses by the defendants and their counsel that would almost certainly have justified significant restrictions on communications under the *Gulf Oil* standard. *See In re Currency Conversion*, 361 F. Supp. 2d at 243-44.[3]

In this Court's view, the principles set forth in *Gulf Oil* and other cases regarding a district court's authority to impose restrictions on communications with putative class members

---

[3] The same is true of another case on which Plaintiffs rely, *Gortat v. Capala Brothers, Inc.*, No. 07cv3629 (ILG) (SMG), 2009 WL 3347091 (E.D.N.Y. Oct. 16, 2009). In that case, after the case had been filed but prior to class certification, the defendant employer solicited affidavits from forty-one employees stating that they did not wish to join the lawsuit. *See id.* at *3.

12

apply to restrictions on plaintiffs' communications and defendants' communications alike. *See* Federal Judicial Center, *Manual for Complex Litigation* § 21.12, at 248 (4th ed. 2004) ("Direct communications with class members . . . *whether by plaintiffs or defendants*, can lead to abuse."). Admittedly, there is a certain surface appeal to the notion that it is always in putative class members' best interests to receive communications from a named plaintiff and his or her counsel, and that there is something inherently coercive about *ex parte* communications between defendants and putative class members or between defense counsel and putative class members. But that appeal disappears when one delves below the surface. Both parties need to be able to communicate with putative class members – if only to engage in discovery regarding issues relevant to class certification – from the earliest stages of class litigation. Furthermore, named plaintiffs and their counsel do not always act in the best interests of absent class members, and not all defendants and defense counsel engage in abusive tactics. District courts thus must not interfere with *any* party's ability to communicate freely with putative class members, unless there is a specific reason to believe that such interference is necessary. The rule proposed by Plaintiffs – which would in essence grant named plaintiffs and their counsel a monopoly on *ex parte* communications with putative class members from the outset – would be manifestly unjust and unfair. *See* Fed. R. Civ. P. 1; Fed. R. Civ. P. 23(d).

**B.**

Applying those principles to the facts of this case, the Court finds there is a basis for imposing limited restrictions on the parties' abilities to communicate with putative class members at the present time. Any restrictions the Court imposes on such communications must be based on "a clear record and specific findings that reflect a weighing of the need for limitation and the potential interference with the rights of the parties." *Gulf Oil*, 452 U.S. at 101; *Rossini*,

798 F.2d at 602. The Court believes that, in light of the fact that it has already indicated that it will certify a class in this case in the future, *see Austen*, 268 F.R.D. at 152, there is a need for some limitations in order to protect the rights of putative class members, particularly those within the class that the Court has already indicated it would eventually certify.

At the same time, however, the Court does not believe there is any "likelihood of serious abuses" by any of the parties in this case. *See Gulf Oil*, 452 U.S. at 104. When other district courts have imposed significant pre-certification communications – for example, requiring prior court approval of all communications with putative class members – they have done so because the parties engaged in serious abuses such as "giv[ing] false, misleading, or intimidating information, concealing material information, or attempting to influence the decision about whether to seek exclusion from a class." *Manual for Complex Litigation* § 21.12, at 249; *see, e.g.*, *Gortat*, 2009 WL 334709, at *3 (describing defendants' attempts to influence putative class members' decisions about whether to seek exclusion from the class after the commencement of litigation). *Cf. In re Currency Conversion*, 361 F. Supp. 2d at 243-44 (concluding that arbitration agreements added to putative class members' contracts after the commencement of litigation were not enforceable). There is absolutely no record in this case to support such significant restrictions.

The Court is not persuaded that the only conduct that either party has objected to here – Attorney Inscoe's *ex parte* communications with Ms. Marquette – was in any way abusive. The Court recognizes that when a defendant is in an ongoing, current business relationship with members of a putative class, for example an employment relationship, it may be prudent to preempt the defendant's ability to use the relationship and pressure class members to make factual concessions or settle claims. *See Manual for Complex Litigation* § 21.12, at 248; *see, e.g.*,

*Rossini*, 798 F.2d at 601 (describing communications by an employer that may have been intended to intimidate putative class members). But the fact that an attorney for a defendant, such as Attorney Inscoe, and a putative class member, such as Ms. Marquette, once worked together does not mean that it is abusive for that attorney to communicate with that putative class member. There is nothing about the type of relationship that Attorney Inscoe and Ms. Marquette had which suggests that communications from Attorney Inscoe to Ms. Marquette are inherently coercive. Moreover, Mr. Marquette herself testified that she did not feel pressured by or intimidated by Attorney Inscoe's communications. *See* Marquette Dep. [doc. # 170-2] at 152-53.

The Court in no way means to suggest that both parties' counsels' conduct has been consistent with the best of all possible professional practices throughout this litigation so far. It would have been better for another Latham & Watkins attorney to contact Ms. Marquette instead of Attorney Inscoe. It would also have been more prudent for Attorney Inscoe to explicitly inform Ms. Marquette about why she was contacting her and about who she was representing, even though Ms. Marquette already knew about the lawsuit and assumed – correctly – that Attorney Inscoe was representing one or more of the Defendants. *See id.* at 188. But the Court cannot say that Attorney Inscoe's missteps constituted misconduct, nor that there is any realistic, foreseeable possibility of any misconduct by Attorney Inscoe or anyone else on Defendants' side of this case. At the same time, it would have been wiser for Plaintiffs' counsel to establish an explicit attorney-client relationship with Ms. Marquette rather than simply allowing her to assume – rightly or wrongly – that such a relationship existed. But again, the Court cannot say that Plaintiffs' counsel has engaged in any misconduct, and the Court does not believe that any future misconduct by Plaintiffs' counsel is likely to occur.

The Court notes that, while this Court's authority to restrict pre-certification communications with class members is limited and discretionary, communications with putative class members prior to certification may also implicate ethical rules. *See* ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 07-445 (2007). Ethical obligations also restrict an attorney's ability to communicate with individuals who are represented by counsel. *See Manual for Complex Litigation* § 21.12, at 249. Thus, it would probably have been unethical for Attorney Inscoe to contact Ms. Marquette if she had been represented by counsel at the time of their communications. Crucially, however, Plaintiffs' lawyers do not argue in opposition to the pending motions that they have ever represented Ms. Marquette. Thus, the Court need not consider at this time whether Ms. Marquette or any other putative plaintiff is currently represented by Plaintiffs' lawyers.

Even if Plaintiffs' counsel had argued that they represented Ms. Marquette at the time when Attorney Inscoe contacted her, the record currently before the Court does not support such a conclusion. In general, "[a] relationship of client and lawyer arises when: (1) a person manifests to a lawyer the person's intent that the lawyer provide legal services to the person; and either (a) the lawyer manifests to the person consent to do so; or (b) the fails to manifest lack of consent to do so, and the lawyer knows or reasonably should know that the person reasonably relies on the lawyer to provide the services . . . ." Restatement (Third) of the Law Governing Lawyers § 14 (2000). There is no evidence in the record that Ms. Marquette manifested an intent to receive legal services from any Outten & Golden lawyer before Attorney Inscoe contacted her, and there is also no evidence that any Outten & Golden lawyer manifested consent to represent her or should have known that she was relying on Outten & Golden to provide her with legal services. To the contrary, Ms. Marquette seems to have simply assumed from receiving a

16

notification about this case from Outten & Golden that she was represented by Attorney Raisner. *See* Marquette Dep. [doc. # 170-2] at 156.

## C.

In light of the Court's conclusion that there is a basis for imposing limited restrictions on the parties' ability to communicate with putative class members, but that there is no record to support more extensive restrictions on such communications, the Court imposes the following restrictions on future communications between counsel for both parties and putative class members:

- First, whenever counsel for a party contacts a putative class member, counsel must explicitly inform the putative class member that he or she is an attorney, and identify the party or parties that he or she is representing in this case, and that the putative class member may be a plaintiff in the case. If the putative class member does not wish to engage in discussion with counsel, counsel should stop all efforts to engage the putative class member.

- Second, counsel must at the outset of the communication ask the putative class member if he or she is already represented by counsel, and if not, whether he or she would like to consult with an attorney before engaging in further communications. If the putative class member indicates a desire to consult with counsel, counsel must cease all communications with the putative class member.

- Third, because the parties seemingly agree that it is appropriate to limit communications with putative class members at this time to discussions regarding the facts of the case and the class aspects for discovery purposes only, counsel shall not communicate with putative class members either directly or indirectly about opting

17

out of a potential class, or about settling any claims related to the claims asserted by Plaintiffs in this case.

- Fourth, counsel for both parties shall keep detailed lists of all the putative class members that they contact prior to certification, and shall submit those lists to the Court when a class certification motion is eventually filed in this case.

### III.

In sum, the Court concludes that while neither party has engaged in misconduct to date, there are good reasons to impose limited restrictions on both parties' abilities to communicate with putative class members. *See Gulf Oil*, 452 U.S. at 101. The Court therefore GRANTS IN PART and DENIES IN PART the two pending motions.

IT IS SO ORDERED.

/s/      Mark R. Kravitz
United States District Judge

**Dated at New Haven, Connecticut: April 6, 2011.**